1

2

FILED _____ ENTERED

3
LODGED _____ RECEIVED

4
MAR 1 5 2002

5
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

6
BY _____ DEPUTY

7

UNITED STATES DISTRICT COURT

8
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

MICROSOFT CORPORATION,

10

Plaintiff,

11
CASE NO. C01-2115C

12
v.

ORDER

LINDOWS.COM, INC.,

13

14
Defendant.

15
        Microsoft Corporation, the world's leading producer of personal computer operating systems,

16
alleges that Lindows.com's use of a "copy cat" trade name which differs by only one letter from

17
Microsoft's senior Windows mark violates trademark law because Lindows.com is trading off of the

18
goodwill of the Windows trademark, causing confusion among prospective purchasers of Windows

19
products and diluting the ability of Microsoft's famous trademark to distinguish its products from those

20
of other producers.  Microsoft's complaint alleges causes of action for trademark infringement and

21
unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and for violation of the Federal

22
Trademark Dilution Act, a 1996 amendment to the Lanham Act, 15 U.S.C. § 1125(c).  The complaint

23
also includes a state law cause of action for violation of Washington's Unfair Business Practices statute,

24
Wash. Rev. Code § 19.86.090.  Microsoft seeks both injunctive relief and monetary damages.  Presently

25

26
ORDER – 1

1    before the Court, is Microsoft's Motion for Preliminary Injunction based on its Lanham Act claims

2    (Dkt. No. 3).

3

4                                              **FACTS**

5

6    **I. Computer Terminology and Brief History of Windows-based Operating Systems**

7        This case involves two competing operating system products: Microsoft Windows and Lindows

8    OS. An operating system is essentially the command center of a personal computer, controlling the

9    allocation and use of computer resources (such as central processing unit time and main memory and

10   disk space) and supporting the functions of software programs, or applications, that perform specific

11   tasks such as wordprocessing. See United States v. Microsoft Corp. (Microsoft I), 84 F. Supp. 2d 9, 12

12   (D.D.C. 1999);[1] Caldera, Inc. v. Microsoft Corp., 72 F. Supp. 2d 1295, 1297 (D. Utah 1999). When

13   software developers write software applications, they rely on pre-fabricated blocks of programming

14   code contained within a specific operating system, and as a result, an application written for a specific

15   operating system generally cannot be run on another operating system. See Microsoft I, 84 F. Supp. 2d

16   at 12-13, 20. Software applications' lack of cross-operating system compatibility presents a major

17   obstacle to entry into the operating system market, see id. at 19-22 (describing applications barrier to

18   entry), and provides the primary motivation for developing the Lindows OS product, see Robertson

19   Supp. Decl. ¶¶ 2-3.

20       The user interface is the combination of a computer monitor's visual displays with the user

21   command functions of the keyboard, mouse or other device. Apple Computer, Inc. v. Microsoft Corp.,

22

23   ─────────────────

24   [1] Although the Court of Appeals for the District of Columbia Circuit vacated the District Court's remedy order and
     reversed in part the conclusions of law, it refused to set aside Judge Thomas Penfield Jackson's findings of fact after
25   reviewing them under the clear error standard. See United States v. Microsoft Corp. (Microsoft II), 253 F.3d 34, 46, 116-18
     (D.C. Cir. 2001).

26   ORDER – 2

799 F. Supp. 1006, 1017 (N.D. Cal. 1992).[2] When a user interface incorporates significant graphical features and functions, as Microsoft Windows does, it is referred to as a graphical user interface, or GUI (pronounced "gooey") in trade parlance. Id. In this case, the central issue is the "windowing" feature of a GUI. Windowing refers to a GUI's use of "overlapping windows to display multiple images on a computer screen in order to facilitate organization of information and the user's interaction with it." Id. at 1027 (describing the Apple Macintosh user interface). Windowing was a substantial breakthrough because it permitted the user to run several applications simultaneously rather than reloading and running separate programs. See Versatile – and Now Affordable – 'Windows.' Separate Display Areas on a CRT Screen, Dun's Business Month, Jan. 1984, at 119 (Park Decl. Ex. H). Central to the windowing feature is the mouse, a now familiar device which controls an on-screen cursor and permits a user to move from one window to another, thus accessing any of the open programs. See id.; Apple, 799 F. Supp. at 1017-18.

The personal computer revolution that took place in the late 1970s and early 1980s is a captivating story in its own right, but most of it is beyond the scope of this Order. It suffices to note that during this time period a number of now familiar companies were fiercely competing to develop and market computers for use by individual consumers. Microsoft, Apple, IBM, Xerox and several other companies were at the core of this rapid development of technology. The period also saw the development of several user interfaces that featured overlapping windows, including Xerox's Smalltalk software and Apple's Lisa and Macintosh operating systems. See id. at 1017-20; Park Decl. Exs. A-R. In the early 1980s, IBM, which had previously produced large mainframe computers, entered the competition with its Personal Computer, or PC. In doing so, it entered a business relationship with two

---

[2] Although the Apple case was one for copyright infringement, Judge Walker's discussion of the history of user interfaces featuring windowing capabilities is relevant to the present action.

ORDER – 3

companies that have since become synonymous with computer technology: Intel and Microsoft. Intel

provided the microprocessor chips for IBM's original PC, and Microsoft supplied the system software

known as MS-DOS, an acronym for Microsoft Disk Operating System. Apple, 799 F. Supp. at 1018.

Microsoft's MS-DOS employed a character-based, non-graphical user interface that required the user to

type specific commands in order to perform tasks such as launching applications and copying files. See

Microsoft I, 84 F. Supp. 2d at 13; Apple, 799 F. Supp. at 1019.

With the early commercial success and user popularity of the Apple Macintosh's windows-based

computer graphics, it became clear to the industry that windowing programs were destined to become

the standard on every personal computer. This intensified the competition and led to what some

commentators dubbed the "window wars." See Microsoft Philosophy Presages Entry in Window Wars,

InfoWorld, Nov. 14, 1983, at 56 (Park Decl. Ex. C); John Markoff, Microsoft Does Windows,

InfoWorld, Nov. 21, 1983 (Park Decl. Ex. D) ("second front in the developing window wars").

Although Microsoft's business partnership with IBM resulted in the pre-installation of MS-DOS

on approximately 40% of personal computers sold by late 1983, see A Fierce Battle Brews Over the

Simplest Software Yet, Business Week, Nov. 21, 1983, at 114 (Park Decl. Ex. E), the company

aggressively joined the window wars with the announcement in November 1983 that it was developing

Windows, a window manager GUI designed to run on the IBM Personal Computer and IBM PC-

compatible computers, see Microsoft Does Windows, supra; Behm Decl. ¶ 2. Microsoft experienced

several delays with its production of Windows, and it was not released to consumers until 1985, in the

form of Microsoft Windows 1.0. See Peggy Watt, Windows Delayed Again, InfoWorld, Nov. 19, 1984,

at 18 (Park Decl. Ex. N); Apple, 799 F. Supp. at 1019. Microsoft's early Windows software was not a

full integration of the operating system and GUI, but rather operated "on top" of MS-DOS as a "shell"

and extended its graphical capabilities. Apple, 799 F. Supp. at 1019 & n.9 (explaining the differences

ORDER – 4

between the Macintosh operating system and the MS-DOS/Windows combination).

While Microsoft made an early entry into the market for windows-based user interfaces, it is undisputed that several other companies had developed interfaces with an overlapping windows feature prior to the 1985 release of Windows 1.0. See Apple, 799 F. Supp. at 1024, 1027 (scénes á faire table). Although at that time the computer industry may not have referred to a GUI's windowing capability by using the term "windows" with the same uniformity as it does today, both the trade press and general publications often referred to this revolutionary feature of personal computers as some variant of "window." See Dvorak Decl. ¶ 17; Park Decl. Exs. A-R; A Fierce Battle, supra ("windowing programs are expected to be standard on every personal computer"); Versatile – and Now Affordable, supra ("The computer industry seems to thrive on buzzwords, and one of the current favorites is 'windows.'"); Andrew Pollack, Integrating the Software, N.Y. Times, Dec. 1, 1983, at D2 ("While Xerox, with its Star, and Apple, with its Lisa, introduced windows and mice . . . ."). Following the advent of Microsoft Windows 1.0, the computer industry continued to use "windows" and "windowing" to refer to portions of a computer's graphical screen dedicated to different programs running simultaneously or partitioned in window-like boxes. See Dvorak Decl. ¶ 19.

## II. Microsoft Windows

Since Microsoft's release of its first version of Windows in 1985, the company has developed nine updated versions of the system software, culminating in the release of Microsoft Windows XP in 2001. See Behm Decl. ¶ 2. After ten years of developing and marketing Windows as an extension of the underlying MS-DOS operating system, Microsoft combined both functions into one product in the August 1995 release of Microsoft Windows 95. Caldera, 72 F. Supp. 2d at 1304-05. Windows 95 was greeted with immediate and immense success, selling approximately 15 million copies in the first four

ORDER – 5

months of its release. Id. at 1305. The company's success with its Windows products has continued to the present day, and it now occupies a dominant position in the worldwide market for Intel-compatible PC operating systems with a greater than 90% share of the market. Microsoft I, 84 F. Supp. 2d at 19; see also Microsoft II, 253 F.3d at 50-80 (affirming district court's findings of fact and conclusion of law under § 2 of the Sherman Act that Microsoft possessed monopoly power over the market for Intel-compatible PC operating systems and that it illegally maintained its power through anticompetitive means).

Ever since 1983 when Microsoft first announced the development of window manager software to extend the graphical capabilities of MS-DOS, it has promoted, sold and licensed the product and its progeny under the Windows name. Van Alstyne Decl. ¶ 3. As with its popular software applications Word, Excel and Office, Microsoft combines its corporate name with the specific Windows version, such as Microsoft Windows NT 4.0 or Microsoft Windows 2000. See Dvorak Decl. ¶ 18. Microsoft has adhered to this branding strategy for each of the ten versions of Windows it has released. See id.; Behm Decl. ¶ 2.

**III. Registration of the Windows Trademark**

Microsoft applied for registration of its Windows trademark in August of 1990, and on January 10, 1995, the United States Patent and Trademark Office ("USPTO") issued U.S. Trademark Registration No. 1,872,264. See Behm Decl. ¶ 3, Ex. A. Microsoft has also successfully registered the Windows mark for several other uses besides its operating system software. See id. Exs. B-D. The initial registration attempt, although ultimately successful, was not as straightforward as a reader of Microsoft's Summary Judgment Memorandum might be led to believe. In fact, the initial registration attempt was rejected by the USPTO in February of 1993. In a thirty-one page Final Action dated

ORDER – 6

1   February 17, 1993, the USPTO rejected registration of the Windows mark because it found that:

2
3
4   the term Windows is widely used, both by the public, consumers, and the relevant industry, to name a class of goods or a type of software, that is, a genus of goods, referred to as windows programs, or windowing software. The term Windows was in existence, and known, _prior_ to adoption by the applicant. Since the term is a generic designation for the applicant's goods, then, no amount of evidence of de facto secondary meaning can render the term registrable.

5

6   Office Action of February 17, 1993 at 30 (Harris Decl. Ex. A, at MS000588) (emphasis in original).   In

7   a supplemental communication on February 22, 1993, the USPTO clarified a technicality from the

8   February 17 action and reiterated its rejection of the registration attempt:

9
10
11
12   The applicant submitted sufficient evidence to present a prima facie claim of acquired distinctiveness of the mark. However, the claim of acquired distinctiveness must be refused, for the reasons stated in the Office action, namely (1) the term Windows is a generic term for a particular type of software including the applicant's goods, and (2) the evidence demonstrates that the applicant's use of the term is not exclusive. That is the term is used generically by the public and throughout the relevant industry.

13   Final Office Action of February 22, 1993 (Harris Decl. Ex. A, at MS000557)

14   The USPTO's rejection of Microsoft's registration of the Windows mark was supported by a

15   Letter of Protest with numerous accompanying documents from Borland International, a company that

16   had several registration applications pending for computer product trademarks containing the word

17   "windows." After the February 22 Final Office Action, Microsoft submitted a Request for

18   Reconsideration in August 1993 containing a thorough review of the legal arguments in the USPTO's

19   Final Office Action, a review of the Letter of Protest's materials and a survey showing that 67% of

20   relevant consumers identified Windows as a brand name. See Ferron Decl. ¶¶ 6-7, Exs. 1-2.  Microsoft

21   also obtained Borland's pending trademark applications for approximately $1 million in the Fall of

22   1993.  Borland, which had vigorously challenged Microsoft's prior attempt at registering the Windows

23   mark, filed no protest letter in Microsoft's renewed registration efforts. See Peterson Dep. at 114-118.

24   In early 1995, the USPTO approved registration of the Windows trademark with no analysis or

25

26   ORDER – 7

explanation for its reversal of the original decision to refuse registration. See Peterson Dep. at 114-15.

Despite Microsoft's successful 1995 registration of the Windows trademark, many companies unaffiliated with Microsoft continue to use either the term "windows" or some portion of the term, such as "win" or "window". Dvorak Decl. ¶¶ 11, 19-20. The use of all or part of "windows" indicates either the incorporation of graphical windows as part of the user interface or compatibility with the Windows operating system. Id. Although Microsoft has taken efforts to enforce certain uses of its Windows trademark, see Ferron Decl. ¶¶ 10-14; Peterson Dep. at 32-33, it has not prevented literally hundreds of trademarks, domain names and products from incorporating all or a portion of "windows" in their names. See Naga Decl. ¶¶ 3-11, Exs. B-O.

## IV. Promotion and Sales of Microsoft Windows

Microsoft has enjoyed considerable success from the sale of Windows, receiving more than $36.5 billion in revenues from Windows products between fiscal years 1992 and 2001 and $21.7 billion in the past three fiscal years alone. See Van Alstyne Decl. ¶ 4. During that same nine year period Microsoft issued more than 677 million licenses for its Windows products and currently has an installed user base of approximately 380 million, making it the operating system used on over 90% of the Intel-compatible personal computers in the world. See id. ¶¶ 5, 7; Microsoft I, 84 F. Supp. 2d at 19. The company's dominance in the operating system market is due in part to the substantial expenditures made in promoting Windows products. Since it announced the first Windows product in 1983, Microsoft has spent over a billion dollars in marketing and promotion, including over $200 million in fiscal year 2002 for the launch of Microsoft Windows XP. Van Alstyne Decl. ¶ 6.

Microsoft distributes its Windows products through a variety of channels, but the vast majority are sold directly to companies such as Dell Computer Corporation and Compaq Computer Corporation,

ORDER – 8

which are known as original equipment manufacturers ("OEMs"). The OEM typically manufacturers the personal computer and installs a copy of Windows before selling the package to the consumer for a single price. Microsoft I, 84 F. Supp. 2d at 13. In his Findings of Fact in United States v. Microsoft, Judge Jackson found that "OEMs are the most important direct customers for operating systems for Intel-compatible personal computers," and "without significant exception, all OEMs pre-install Windows on the vast majority of PCs that they sell . . . ." Id. at 24. The court also found that OEMs are "surrogates for [individual] consumers in identifying reasonably-available commercial alternatives to Windows." Id. In addition to OEMs, Microsoft licenses Windows and Windows upgrades to corporate customers and distributes the same products directly to individual retail consumers through retail and mail order outlets and via the Internet. See Van Alstyne Decl. ¶ 2. In 2002, approximately 5% of all Windows licenses were sold through retail outlets, including Microsoft's online store. Van Alstyne Decl. in Supp. of Reply ¶ 3.

**V. Lindows.com and Lindows OS**

Lindows.com was founded in July 2001 by Michael Robertson, who also is the founder and former CEO of MP3.com, Inc. The company is developing an operating system called Lindows OS which is based on the Linux operating system and has the ability to run software applications developed for both the Linux and Windows operating systems. See Robertson Supp. Decl. ¶¶ 2-3; Tessier Decl. Exs. F-2 to F-4. Lindows OS will also feature a GUI that resembles the overlapping windows GUI of Microsoft Windows. See Tessier Decl. Ex. F-2. Linux is an "open-source" operating system that was created and is continuously updated by a corps of freelance software developers. Microsoft I, 84 F. Supp. 2d at 23. The majority of Linux's ten to fifteen million users merely employ the operating system to run servers, not personal computers. Id. Because software applications typically can only be run on

ORDER – 9

the operating system for which they are written, Lindows OS presents a notable development in the computer industry and a potential means of broadening consumer options.

Lindows.com plans to release its first commercial version of Lindows OS to consumers sometime in 2002. Robertson Supp. Decl. ¶¶ 3, 5-6. According to Robertson, Lindows OS will be available either by downloading the software directly from Lindows.com servers or by placing an order for a CD-ROM containing the software from the company's web site – www.lindows.com. Id. ¶ 8. The website also indicates that the company has considered selling Lindows OS through OEM and retail channels. See Tessier Decl. Ex. A-4 ("Eventually you'll see computer manufacturers offering systems pre-installed with Lindows OS . . . . If Lindows OS becomes available in a retail environment, subscribers to Lindows.com's mailing list will be the first to know."); see also Tessier Decl. in Supp. of Pla.'s Mot. for Relief from Deadline (online questionnaire about OEM program). Although Lindows.com is enlisting its enthusiasts to help its marketing campaign, see Tessier Decl. Ex. D-1 ("We don't have the billion dollar marketing budget, so your help will be invaluable in getting the word out that there's a new choice emerging on the desktop."), the company has still spent a significant part of its resources, approximately $1.5 million, to promote the Lindows.com and Lindows OS brands. See Robertson Supp. Decl. ¶ 10.

The  web site plays a critical role in Lindows.com's planned distribution of the Lindows operating system, id., and it figures prominently in the company's promotional and marketing efforts. At its web site, Lindows.com prominently displays its corporate and product logos, provides links to press reports regarding its Lindows OS product and invites visitors to subscribe to a newsletter mailing list and to email the site directly. See Tessier Decl. Exs. A-1, F-1 to F-41. The web site also encourages visitors to link their websites to the www.lindows.com site by displaying one of several Lindows.com banner advertisements. See id. Exs. C-E. Finally, the Court takes judicial notice that the Lindows.com

ORDER – 10

web site, which at the inception of this litigation contained no disclaimer regarding its affiliation with Microsoft, see Tessier Decl. Exs. A-1 to A-30, now includes the following statement at the bottom of the pages of its web site: "Lindows.com is not endorsed by or affiliated with Microsoft Corporation in any way."

## VI. Microsoft's Requested Remedies

Microsoft's suit under three sections of the Lanham Act and Washington's Unfair Business Practices statute seeks both injunctive and monetary relief. Primarily, it seeks an injunction prohibiting Lindows.com from (1) using the Lindows, Lindows.com or Lindows OS trade names or trademarks in connection with its software or other computer product or service, (2) infringing Microsoft's Windows trademark, and (3) diluting Microsoft's Windows trademark. It also seeks treble damages under the Washington statute and the Lanham Act § 35(a) as well as attorney fees and costs. See Compl. at 10.

## PRELIMINARY INJUNCTION

The Ninth Circuit applies a sliding scale standard to the showing a party must make to prevail on a preliminary injunction motion. Dr. Seuss Enters. v. Penguin Books USA, Inc., 109 F.3d 1394, 1397 n.1 (9th Cir. 1997). Here, Microsoft must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id. Rather than two separate tests, these points represent the outer reaches of a single continuum in which the requisite showing of harm increases as the probability of success on the merits decreases. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 840 (9th Cir. 2001); Dr. Seuss, 109 F.3d at 1397 n.1. "Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury." Dr.

ORDER – 11

1  Seuss, 109 F.3d at 1397 n.1 (quoting Big Country Foods, Inc. v. Board of Educ., 868 F.2d 1085, 1088

2  (9th Cir. 1989)).

3

4  **I. Probability of Success on the Merits**

5   **A. Validity of the Mark**

6    Prior to reaching the merits of the three federal trademark causes of action, the Court must

7  determine whether the Windows trademark is a valid, protectable mark.  If the term lacks sufficient

8  distinctiveness so that it is generic, "it cannot be the subject of trademark protection under any

9  circumstances." Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, 198 F.3d 1143, 1146 (9th Cir.

10  1999); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d Cir. 1999) ("Distinctiveness is a

11  crucial trademark concept, which places marks on a ladder reflecting their inherent strength or

12  weakness."); I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998) (holding that

13  distinctiveness is a prerequisite for protection from trademark infringement and dilution).

14    **1. Categories of Distinctiveness**

15    The degree of distinctiveness of a mark is directly related to the breadth of the protection it can

16  command, and trademark law has identified and prioritized four categories of terms  with respect to their

17  distinctiveness.  In order of decreasing protection, marks can be (1) arbitrary or fanciful, (2) suggestive,

18  (3) descriptive or (4) generic.  Filipino Yellow Pages, 198 F.3d at 1146-47 (quoting Surgicenters of

19  America, Inc. v. Medical Dental Surgeries Co., 601 F.2d 1011, 1014 (9th Cir. 1979)).  An arbitrary and

20  fanciful term is one which is invented solely for its use as a trademark and is thus afforded the greatest

21  protection. Surgicenters, 601 F.2d at 1015. A suggestive term requires some imagination or perception

22  to determine the nature of the goods, as opposed to a descriptive term which specifically describes a

23  characteristic or attribute of an item or service. Id. at 1014-15. A descriptive term generally does not

24  enjoy trademark protection unless "it has acquired 'secondary meaning' in the minds of consumers, i.e.,

    it has 'become distinctive of the [trademark] applicant's goods in commerce.'" Filipino Yellow Pages,

25

26  ORDER – 12

198 F.3d at 1147 (quoting Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 10 (2d Cir. 1976) (Friendly, J.)). In contrast, a suggestive term is inherently distinctive and thus entitled to protection without proof of secondary meaning. Surgicenters, 601 F.2d at 1015. Finally, a generic term, "one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species," is not protectable even if it has acquired distinctiveness or secondary meaning. Id. at 1014.

The lines of demarcation between these four categories are not always clear, id., but in the present case, the parties have focused exclusively on whether the mark is generic or descriptive. This particular distinction has proved particularly nettlesome for courts, as "[t]he difference between a generic mark and the weakest of descriptive marks may be almost imperceptible." Filipino Yellow Pages, 198 F.3d at 1151 n.5. Because the parties have presented compelling arguments that the Windows mark is generic and that it has acquired secondary meaning, drawing the line properly in this case is far more critical than in cases involving marks that are generic and lack secondary meaning. See, e.g., id.; Surgicenters, 601 F.2d at 1017-18.

## 2. Burden of Proof

The Windows mark was initially registered in 1995 for "computer programs and manuals sold as a unit; namely, graphical operating environment programs for microcomputers," Behm Decl. Ex. A , so it triggers the Lanham Act's presumption that "[a] certificate of registration of a mark . . . shall be prima facie evidence of the validity of the registered mark . . . ." 15 U.S.C. § 1057(b). Because of the presumption of validity, Lindows.com bears the burden of proving genericness. See Filipino Yellow Pages, 198 F.3d at 1146; 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:12 (4th ed. 2001) (hereinafter McCarthy). A party challenging a registered mark must show by a preponderance of the evidence that it is invalid. See 555-1212.com, Inc. v. Comm. House Int'l, Inc., 157 F. Supp. 2d 1084, 1088 (N.D. Cal. 2001) (citing Vuitton Et Fils S.A. v. J. Young Enters., Inc., 644 F.2d 769, 776 (9th Cir. 1981)).

ORDER – 13

### 3. Legal Standard for Finding a Mark Generic

"A generic term is one that refers to the genus of which the particular product is a species." Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 821 (9th Cir.1996) (quoting Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194 (1985)). In other words, when a trademark's primary significance is to describe the type of product rather than the producer or source, the mark is a generic term. See Filipino Yellow Pages, 198 F.3d at 1147 (quoting Anti-Monopoly, Inc. v. General Mills Fun Group, 611 F.2d 296, 304 (9th Cir. 1979)). The Lanham Act itself contains a test for genericness: "The primary significance of the . . . mark *to the relevant public* . . . shall be the test for determining whether the . . . mark has become the generic name of goods or services on or in connection with which it has been used." 15 U.S.C. § 1064(3) (emphasis added).[3]

The Ninth Circuit has "often relied" upon the "who-are-you/what-are-you" test in determining whether a term is generic. Filipino Yellow Pages, 198 F.3d at 1147. If a mark answers the buyer's question "Who are you?" "Where do you come from?" then the mark is valid because a buyer understands it to refer only to a particular source of the goods or services. See id.; Surgicenters, 601 F.2d at 1016. On the other hand, when a mark answers the buyer's "What are you?" question, the mark is generic and invalid because it is identified with all such goods or services regardless of their producers. See id.; see also 2 McCarthy § 12:1.

The various embodiments of the test for genericness indicate that a specific subset of all possible consumers, "the relevant public," is the proper focus of the Court's inquiry. See, e.g., Yost, 92 F.3d at 821 (affirming district court's identification of the "relevant public"); Surgicenters, 601 F.2d at 1017 (identifying "consuming public"). In the present case, Microsoft's Windows trademark is used to identify "graphical operating environment" computer programs and related items such as instruction manuals. See Behm Decl. Ex. A. As noted above, Microsoft Windows is designed to run only on Intel-compatible personal computers and is the operating system installed on over 90% of these machines.

---

[3] This test is generally regarded as a codification of Judge Learned Hand's inquiry in Bayer Co. v. United Drug Co., 272 F. 505, 509 (S.D.N.Y. 1921): "What do the buyers understand by the word for whose use the parties are contending?" Magic Wand, Inc. v. RDB, Inc., 940 F.2d 638, 640 (Fed. Cir. 1991).

ORDER – 14

1   Thus, the Court finds that the relevant consuming public for the goods associated with the contested

2   trademark consists of all owners and users of Intel-compatible personal computers.[4]

3              **3. Lindows.com's Evidence of Genericness**

4              Whether a trademark is generic is a question of fact.  Yost, 92 F.3d at 821.  A court may rely on

5   a variety of evidence in determining the validity of a mark, including competitors' use, plaintiff's use,

6   dictionary definitions, media usage, testimony of persons in the trade and consumer surveys.  See 2

7   McCarthy § 12:13 - 12:14.  The evidence may relate to the time period of the alleged infringement or

8   dilution or to the time when the mark's proponent introduced its designation onto the market.  Id. §

9   12:13.  Here, Lindows.com has presented evidence in five of the six categories, omitting only consumer

10  surveys, to support its claim that the Windows trademark is generic.

11             **a. Media Usage**

12             A term's appearance as a generic name in both the general and trade press can serve as an

13  indication that the consuming public perceives the term to be generic.  See Surgicenters, 601 F.2d at

14  1017 n.17; see also Murphy Door Bed Co. v. Interior Sleep Sys., 874 F.2d 95, 101 (2d Cir. 1989).

15  Lindows.com provided press reports from the early 1980s that referred to "window wars" and described

16  "windows" as a favorite "buzzword" of the computer industry.  See Park Decl. Exs. C, D, H. Making a

17  highly accurate forecast about the rapidly changing computer market, Business Week predicted that

18  "windowing programs" would become a standard feature of every personal computer.  See Park Decl.

19  Ex. E.  In addition, advertisements for computer programs containing overlapping windows graphical

20  displays also referred to "windows" generically in the decade preceding Microsoft's successful

21  registration of the trademark.  See Harris Decl. Ex. A, at MS000727-794.  Both the advertisements and

22  press articles show that the consuming public associated the term "window(s)" with a graphical feature

23  of a computer's user interface or software application rather than with Microsoft's product prior to

_____

24  [4] The Court's selection of the relevant consuming public is broader than the sample population in the survey
    Microsoft submitted to the USPTO in 1993.  There, the survey focused only on those individuals who had purchased
25  computer software in the past twelve months or were likely to purchase software in the next three months.  See Zandan Decl.
    ¶ 3 (in Ferron Decl. Ex. 2).

26  ORDER – 15

Windows' release in 1985 and still considered it to have some generic meaning at the time of the trademark's registration with the USPTO.

Although the widespread use of Windows products in recent years has resulted in their frequent mention by the media, this Court's search of the LexisNexis database revealed that the generic use of the term continues to appear in the press. See, e.g., David Pogue, That P in PC Now Stands for Picture, N.Y. Times, Feb. 28, 2002, at G1 ("A Windows XP desktop window offers two new views" and several other generic references to "window"); Stanley Miller II, The Milwaukee Journal Sentinel, March 5, 2002 ("You can see through an open web browser window to an email program running underneath it."); David Pogue, Windows XP: Microsoft's New Look for Fall, in Size XXL, N.Y. Times September 6, 2001, at G1 (several generic uses of "window" in review of Microsoft's latest operating system); David Pogue, A New Face (and Heart) For the Mac, N.Y. Times March 29, 2001, at G1 ("overlapping windows" and "pop-up windows").

### b. Dictionary Definitions

The use of a term in dictionaries is also indicative of the public's perception of the term's meaning. The Ninth Circuit has placed significant weight on a term's dictionary definition but has been careful to emphasize that such evidence on its own is not determinative. See Filipino Yellow Pages, 198 F.3d at 1148 (quoting Surgicenters, 601 F.2d at 1015 n.11) ("While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public, the ultimate test of whether a trademark is generic."). Both computer-specific and general dictionaries from the early 1980s to the present contained definitions of "window(s)" indicating it was understood by the public to have the generic meaning offered by Lindows.com. See Charles J. Sippl, Computer Dictionary 554 (4th ed. 1985) (Harris Decl. Ex. A, at MS000621) (defining "window" as "[a] software device, used in multiprocessing environments, that allows a terminal to be used to run several processes at once. The terminal screen is divided up into several windows . . . ."); Microsoft Computer Dictionary 481 (4th ed. 1999) (Harris Decl. Ex. D) ("window n. In applications and graphical interfaces, a portion of the screen that can contain its own document or message. In window-based programs, the

ORDER – 16

screen can be divided into several windows, each of which has its own boundaries and can contain a different document (or another view into the same document)");[5] The Random House Dictionary of the English Language 2177 (2d ed. 1987) ("window . . . n. . . . . 11. Computers. a section of a display screen that can be created for viewing information from another part of a file or from another file").

### c. Microsoft's Use of the Term

The way in which a party claiming trademark protection uses the term is also relevant to a determination of the mark's validity. See Surgicenters, 601 F.2d at 1017 n.19 (letters by Surgicenter founder recognizing the term was used in a generic sense). There is indirect evidence that Microsoft considered Windows to be generic at the time it began using the trademark. When Microsoft first released Windows in 1985, it referred to its new GUI not as "Windows" but as "Microsoft Windows 1.0." This suggests that in order to distinguish the product name from the generic class of GUI products in the market, Microsoft needed to add the company name trademark to the product name. See 2 McCarthy § 12:26 (discussing the importance of creating a generic name in addition to the trademarked brand name); see also Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 809 (2d Cir. 1999) ("Honda hog" as the combination of a tradename adjective with a generic name for motorcycles to create uniqueness). It is also telling that despite Microsoft's investment of hundreds of millions of dollars in promoting its Windows products and the widespread recognition and popularity of Windows in the world market for Intel-compatible personal computer operating systems, the company continues to market Windows using a logo containing both "Microsoft," "Windows" and a version-specific suffix. See Behm Decl. Ex. E (in seven of eight advertisements for recent versions of Windows, the company name appears next to the Windows product name). The Court recognizes that this evidence is not nearly as strong as Dr. Reed's admissions in Surgicenters, but it is nonetheless relevant to drawing an inference regarding Microsoft's own understanding that its Windows mark might be generic.

---

[5] Not surprisingly, Microsoft's dictionary contains several definitions of its Windows operating systems, see pp. 482-84.

ORDER – 17

1

### d. Competitor's Use of the Term

2     The Ninth Circuit has accepted evidence of third party competitors' use of the contested term to

3 determine whether it is generic. See Stuhlbarg, 240 F.3d at 840 (terms at issue were "widely used by

4 third parties in the safe industry"). In its defense of a copyright suit brought by Apple Computer,

5 Microsoft successfully argued that several companies had introduced user interfaces featuring

6 overlapping windows prior to Microsoft's announcement of its Windows product. See Apple, 799 F.

7 Supp. at 1017, 1024, 1027; see also Dvorak Decl. ¶ 17 (describing both GUI and non-GUI windows

8 systems produced by Xerox, Apple, Digital Research, Quarterdeck and VisiCorp). Microsoft Windows'

9 dominance in the modern computing environment makes it easy to describe these graphical features as

10 "windows" in hindsight, but Lindows.com's evidence makes clear that the same term was used by the

11 industry and the press during the early development of this now-standard feature. See Dvorak Decl. ¶

12 17; Park Decl. Exs. A-R; see also Harris Decl. Ex. A, at MS 000582-586, 1012-66 (USPTO Office

13 Action listing numerous registered trademarks and third party applications for marks using "windows"
to identify a type of computer software).

14     Widespread public use of a term has also been relied upon by at least one court to rebut the

15 presumption of validity and as well as to find the term generic. See 555-1212.com., 157 F. Supp. 2d at

16 1088-90 (relying on declaration that 555-1212 phone number had been used for many years to denote

17 telephone directory services). Here, Lindows.com presents literally hundreds of computer products,

18 software companies and trademarks that incorporate the term "windows" or a variants such as "win" or

19 "window" in their name to support its argument that the term has taken on a second generic meaning –

20 compatibility of software applications with the Windows operating system. See Naga Decl. & Exs. B-

21 O; Dvorak Decl. ¶¶ 19-20 (describing WinAmp, WinZip and WindowBlinds). While this use of

22 "windows" does refer to the type of product rather than the source, the Court finds the evidence less

23 probative than the direct competitors' use of the windows term in the early 1980s because use of the

24 term as an indicator of compatibility may still preserve the distinctiveness of the dominant product.
There is no evidence that purchasers of WinAmp and similarly named products have ceased to associate

25

26 ORDER – 18

1   the Windows operating system with Microsoft. Further, the "compatibility" use of a trademark could

2   lead to a substantial weakening of trademark protection because it would effectively immunize products

3   trading off the goodwill of a mark under the guise that they complement or are compatible with the

4   senior mark.

5       Nonetheless, the sheer volume of windows-related uses in the computer industry is notable.

6   Microsoft is correct that its decision not to prosecute all the users of its marks, see Peterson Dep. at 86-

7   87; Ferron Decl. ¶¶ 10-14, is not an indication of abandonment of the mark.  See Wallpaper Mfrs. v.

8   Crown Wallcovering Corp., 680 F.2d 755, 766 (C.C.P.A. 1982).  Rather, the ubiquity of "windows"

9   variants in the computer market may tend to show the mark is generic, as "distinctiveness can be lost by

    failing to take action against infringers.  If there are numerous products in the marketplace bearing the
10
    alleged mark, purchasers may learn to ignore the 'mark' as a source of identification." Id., quoted in 2
11
    McCarthy § 17:17.
12
                        **e. Testimony of Persons in the Trade**
13
        With an admonition regarding the suspect impartiality of people associated with the trademark
14
    holder, Professor McCarthy states that the "understanding of those who are familiar with the
15
    marketplace usage of the designation in question can be helpful evidence on the genericness issue." 2
16
    McCarthy § 12:13 (citing Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59
17
    F.3d 902, 910 (9th Cir. 1995)).  Lindows.com relies heavily on the declaration of John Dvorak, a long-
18
    time professional commentator on the computer industry.  See Dvorak Decl. ¶¶ 2-9.  According to his
19
    declaration, the term "windows" and its variants have been used by the computer industry for two
20
    different generic meanings.  First, the term "refer[s] to portions of the graphical screen dedicated to
21
    different programs running simultaneously or partitioned in window-like boxes." Id. ¶ 19.  A more
22
    recently adopted meaning uses "windows" to "suggest compatibility with the dominant Microsoft
23
    operating system platform." Id.

24

25

26   ORDER – 19

1

#### 4. Conclusion for Rebuttal Evidence

2    The burden of proof for rebutting a registered trademark's presumption of validity is

3 preponderance of the evidence. See 555-1212.com, 157 F. Supp. 2d at 1088 (citing Vuitton Et Fils S.A.

4 v. J. Young Enters., Inc., 644 F.2d 769, 776 (9th Cir. 1981)); see also Door Sys., Inc. v. Pro-Line Door

5 Sys., Inc., 83 F.3d 169, 172 (7th Cir. 1996) ("The presumption . . . evaporates as soon as evidence of

6 invalidity is presented. . . . Its only function is to incite such evidence and when the function has been

7 performed the presumption drops out of the case.") (citations omitted).  Lindows.com has presented

8 substantial evidence that, prior to the time that Microsoft first announced its Windows product, the

9 consuming public understood "windows" or "window" to refer to a type of GUI or operating system

feature and today understands the terms to indicate software applications that are compatible with

10 Microsoft Windows.  The Court is aware of the Ninth Circuit's emphasis on the proper placement of the

11 burden of proof when a party is challenging the validity of a registered trademark as compared to an

12 unregistered one.  See Filipino Yellow Pages, 198 F.3d at 1148, 1151 (comparing Filipino Yellow

13 Pages, an unregistered mark, to Surgicenters, a registered mark).  In the present case, the evidence

14 submitted by Lindows.com is comparable in volume and quality to the evidence presented by the

15 defendant in Surgicenters and is far more substantial than the "modest evidence of genericness" in

16 Filipino Yellow Pages, id. at 1151.  As a result, the Court finds that Lindows.com has met its burden of

17 proof in rebutting the validity of the Windows trademark and thus the "presumption drops out of the

18 case."

19

#### 5. Microsoft's Arguments for Validity

20    Microsoft counters Lindows.com's evidence of genericness with only sparse support for its

21 claim that Windows falls into a protectable category.  See 555-1212.com, 157 F. Supp. 2d at 1089

22 (describing shift in burden to the trademark's proponent).  Aside from disagreeing with Lindows.com's

23 application of trademark law and attempting to distinguish the cases upon which it relies, Microsoft

24 supplies minimal affirmative evidence to support its claim that Windows is non-generic.  Rather, it

25 repeatedly asserts that Windows is  a descriptive mark that has acquired secondary meaning and is thus

26 ORDER – 20

protectable under the Lanham Act.

### a. Microsoft's Evidence

The Court first turns to the evidence submitted by Microsoft consisting primarily of several consumer surveys that show a high degree of recognition of the Windows brand among the consuming public. Consumer surveys are a common means of supporting or challenging the validity of a trademark. See 2 McCarthy § 12:14. To be effective, "the survey must be directed at the issue of consumer perception as to the significance and meaning of the designation in issue. A survey that merely tests for consumer awareness of the designation is irrelevant." Id. (quoting Stuhlbarg, 240 F.3d at 840). The Ninth Circuit has emphasized that a trial court may consider factors such as "survey design, nature of the questions asked, and the experience and reputation of the surveyor" in determining the weight to accord a survey. Stuhlbarg, 240 F.3d at 840 (citing E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292-93 (9th Cir. 1992)). The Stuhlbarg court affirmed the district court's decision to ascribe minimal weight to a consumer survey that purported to show a certain percentage of consumer awareness of the contested term without providing any information about the survey design, questions or methodology. Id. ("Simply asserting consumer awareness of the term begs the question.")

In support of its Motion for Preliminary Injunction, Microsoft submitted the Declaration of Bobbie Oglesby, the current Director of Branding for Microsoft and the former Brand Manager for Windows. See Oglesby Decl. ¶ 1. The first survey mentioned was conducted for Microsoft in 1999 and shows that 93% of personal computer users recognized the Windows brand. See id. ¶ 3. No exhibits are attached to demonstrate the methodology or explain the survey design, and without such a foundation, the Court has no alternative but to ascribe a bare minimum of weight to the result. The next survey described by the Oglesby Declaration was conducted by Landor Associates. Landor surveyed "on-line" consumers in early 2001 and concluded that Windows was the No. 1 brand overall and No.3 in distinctiveness. Id. ¶ 4. The Declaration attaches a copy of the ImagePower brand survey results which displays the top twenty "Marks of Distinction" in ten countries as published in the July 2001 issue of Wired Magazine. See id. Ex. 1. Based on the one page exhibit, it is impossible for the Court to analyze

ORDER -- 21

the Declaration's assertion that "Windows ranked No. 1 overall" because the submitted evidence lacks meaningful information about survey methodology. Accordingly, the Court finds it to be of little probative value in showing that Windows is a protectable trademark. The final survey mentioned in the Oglesby Declaration was also conducted by Landor Associates in 2001 and showed that "in the United States, almost 80% of the general public is aware of the Window (sic) brand." Id. ¶ 5. As discussed in Stuhlbarg, such "consumer awareness" surveys merely "beg[] the question." 240 F.3d at 840. The Court therefore declines to give any substantial weight to this survey, or the others described in the Oglesby Declaration.

Finally, Microsoft's Reply Memorandum includes a copy of the survey conducted for it by IntelliQuest in 1993. See Ferron Decl. Ex. 2. This survey is completely substantiated and explained by Peter Zandan, who supervised and designed the questionnaire. The purpose of the survey was to determine if consumers who had purchased computer software in the past 12 months or were likely to purchase software in the next three months recognized "Windows" primarily as the product of a single company rather than the name of a type of product put out by more than one company. The result of this survey indicated that 100% of respondents were familiar with "windows" in the computer context and that approximately 67% of the relevant consumer population identified "Windows" as the "brand name of a product put out by one company." See Ferron Decl. Ex. 2 (attaching Zandan Decl. and Exs.). The IntelliQuest survey is due far more weight by the Court than the three surveys discussed above because it is supported by exhibits demonstrating the survey's methodology, questions and design.

Nonetheless, the 1993 survey's probative value is limited by the fact that it was taken approximately fourteen years after the introduction of Xerox's Smalltalk software which pioneered the overlapping windows feature of user interfaces and ten years after Microsoft first announced its Windows product. Lindows.com has submitted a substantial volume of evidence in support of the generic use of "windows" by the computer industry and the press in the early 1980s. This evidence predates the IntelliQuest survey by at least ten years and raises significant questions about the genericness of the term even before Microsoft announced Windows in 1983. A particularly high burden

ORDER – 22

1   rests on the holder of the trademark who is advancing an argument that the mark has been "reclaimed

2   from the public domain by a change in consumer usage over a long period of time." 2 McCarthy §

3   12:30-12:32 (discussing the Singer and Goodyear cases). Although both Singer and Goodyear differ

4   from the present case in that they involved a mark that was once valid, later became generic, and then

5   finally returned to protectable status, the Court does not find this distinction to alter the requisite level of

6   rigor needed to reclaim a mark from the public domain. Another distinction between Goodyear and

7   Singer that points in favor of Lindows.com is the fact that both of the marks involved there were

8   personal names rather than marks with low inherent distinctiveness, as "windows" is. See id. § 12:30

9   (citing Harley-Davidson, 164 F.3d at 811 (agreeing with Treatise and stating " if a generic word could

10  ever be infused with trademark significance, the word must have ceased to have current generic

11  meaning.")). As Lindows.com's evidence shows, the term "windows" retains at least some generic

12  meaning today, suggesting that Microsoft has not completely reclaimed the term from the public

    domain.

13                              **b. Microsoft's Other Arguments**

14          In addition to the four surveys, Microsoft's Reply Memorandum attempts to rebut several of the

15  legal arguments and distinguish the case law upon which Lindows.com relied to advance its claim that

16  Windows is generic. Microsoft first points out that the burden of proof in rebutting the presumption of

17  validity of a registered trademark lies on the party challenging the mark, see Reply Mem. at 5, and

18  distinguishes cases such as Filipino Yellow Pages and Intel Corp. v. Advanced Micro Devices, Inc., 756

19  F. Supp. 1292 (N.D. Cal. 1991), both of which involved unregistered marks. The Court has applied the

20  case law properly by placing the burden of proof on Lindows.com and concludes that Lindows.com

21
22  satisfied the burden of rebutting the presumption of validity by a preponderance of the evidence.

23          Microsoft also disagrees with Lindows.com's application of the "who-are-you/what-are-you"

24  test for genericness. See Reply Mem. at 5. Arguing that "windows" does not represent the genus of

25  operating system software because no consumer would go to a store and ask for "a windows" when she

26  ORDER – 23

wants an operating system, Microsoft contends that Windows is properly characterized as descriptive and that it has acquired substantial secondary meaning. While the Court agrees that the Windows mark has acquired secondary meaning,[6] no degree of secondary meaning will save a generic mark. See Surgicenters, 601 F.2d at 1016 (even if a product acquires "secondary meaning as indicating the origin of the goods, such circumstance could not 'take the Common descriptive name of an article out of the public domain . . . no matter how much money or effort it pours into promoting the sale of the merchandise.'") (quoting the "Matchbox Case," 280 F.2d 437, 440 (C.C.P.A. 1960)). Although "windows" does not answer the "what are you" question persuasively, this is not dispositive, as the Ninth Circuit has not held that it is the exclusive test for genericness. See Filipino Yellow Pages, 198 F.3d at 1147 ("what-are-you" test is "often relied upon").

The difficulty in applying the "what-are-you" test is that it favors an affirmative response for nouns rather than adjectives. As noted by Professor McCarthy, the "part of speech" test does not accurately describe the case law results. See 2 McCarthy § 12:10. Thus, a generic adjective can exist if it names the most important feature or purpose of a product. Id. (citing the Matchbox toy vehicles example). Another well-known example of a generic term that similarly does not provide a sensible answer to the "what are you" test is "Light Beer" or "Lite Beer." In that case, the Seventh Circuit found that the terms "lite" and "light" indicated a type of low calorie or low alcohol beer rather than a specific source of the beer. See Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 81 (7th Cir. 1977) ("Otherwise a manufacturer could remove a common descriptive word from the public domain by investing his goods with an additional quality . . . ."). In short, the "what are you" test does not provide a conclusive answer to the Court's inquiry into whether Windows is generic or descriptive.

---

[6] The following factors are relevant to a court's determination of whether secondary meaning has been acquired: "(1) whether actual purchase[r]s of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive." Yost, 92 F.3d at 822.

ORDER – 24

1     As the Court mentioned earlier, there is only a fine line separating generic and descriptive marks

2  – those which either name a thing or describe a thing. Yet, merely arguing that because a term describes

3  some aspect of a thing it must be descriptive, and hence non-generic, grossly "misunderstands and

4  oversimplifies the inquiry at stake for trademark purposes." Mil-Mar Shoe Co. v. Shonac Corp., 75

5  F.3d 1153, 1158 (7th Cir. 1996) (finding "Warehouse Shoes" to be generic by focusing on dictionary

6  definitions and third party use). "[A]ssuming that any element of description within a mark

7  automatically precludes that mark from being found to be generic is factually and legally inaccurate

8  . . . ." Id. at 1157. The proper focus of an inquiry into a mark's distinctiveness is whether it is a "kind,

9  sort, genus or subcategory" as opposed to whether it "convey[s] a quality or characteristic of a product."

10  Henri's Food Prods. Co. v. Tasty Snacks, Inc., 817 F.2d , 1303, 1306 (7th Cir. 1987). In Henri's Food

11  Products, the Seventh Circuit addressed whether "tasty" (or "tas-tee") was generic and concluded it was

12  not because it "merely describes the quality of salad dressing." Id. To demonstrate the proper

13  distinctiveness analysis, the court contrasted "French dressing" with "tasty salad dressing." Clearly,

14  "French" represented a kind, subtype or category of dressing, while "tasty" did not. See id.[7] Much like

15  the "French dressing" example, "windows" does not describe a quality of software applications, but

16  rather signifies a "kind, sort, genus or subcategory."

17     Microsoft also challenges the lengthy list of trademarks, company names, projects and products

18  that use "windows" or some variant of the term in their title. See Reply Mem. at 7. Citing Eclipse

19  Assocs., Ltd. v. Data General Corp., 894 F2d 1114, 1119 (9th Cir. 1990), Microsoft argues that

20  unrelated uses by third parties are irrelevant to trademark infringement analysis. Eclipse is

21  distinguishable on two grounds, however. First, the unrelated uses of the mark were involved in a

22  likelihood of confusion, rather than a validity, analysis. Second, the plaintiff in the case used the mark

23  in relation to computer equipment, while the excluded uses were not related to the computer industry.

24  Here, in contrast, Lindows.com has only offered uses of "windows" within the computer industry, the

25     [7] It goes without saying that the "French dressing" example would also fail the "what are you" test.

26  ORDER – 25

1   same consumer market in which Microsoft does business.

2

3   **B. Conclusion as to Validity**

4   The volume of evidence required to show, or disprove, the validity of a trademark is not well-

5   suited to the early stages of litigation such as this motion for preliminary injunctive relief.  Given the

6   urgency of Microsoft's request for equitable relief, the Court need not at this time make a conclusive

7   determination as to whether the Windows mark is in fact generic.  Rather, the Court's role in deciding a

8   motion for preliminary injunction is to evaluate the limited record before it and make a determination

9   regarding the moving party's probability of success on the merits.  Because the validity of the Windows

10  mark is a threshold issue upon which all subsequent analysis of dilution, infringement and unfair

11  competition depends, the Court finds that the compelling arguments made by both parties leave it

12  weighing two roughly equal bodies of evidentiary support.  As a result, the Court concludes that, at

13  most, Microsoft has raised serious questions about the validity of its trademark, but has fallen short of

    showing probable success.  The Court now turns to the second part of the preliminary injunction

14  analysis, the threat of irreparable injury.

15

16

17  **II. Irreparable Harm**

18  Once the Court has concluded that "serious questions" are raised about the merits, it must

19  determine whether "the balance of hardships tips sharply in favor of the moving party."  Stuhlbarg, 240

20  F.3d at 840.  "In evaluating the balance of hardships a court must consider the impact granting or

    denying a motion for a preliminary injunction will have on the respective enterprises."  Int'l Jensen, Inc.

21  v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993) (considering the relative size and strength of

22  the parties).

23

24  In its briefs, Microsoft relies on the "probability of success" side of the preliminary injunction

25  sliding scale and lets the accompanying presumption of irreparable harm do most of its leg work.  See

26  ORDER – 26

Reply Mem. at 13. It argues that injunctive relief is preferred in trademark violations because monetary damages are often inadequate and that Lindows.com will be unable to afford the presumably large damages award. Lindows OS is not designed to run all Microsoft programs, and it will likely experience defects once it is released, thus tarnishing the goodwill of the Windows mark among confused consumers. Finally, Lindows.com has spent a minimal amount, compared to Microsoft's billion dollar marketing campaign, to promote its brand, and as a newcomer that has intentionally infringed, it cannot complain when its conduct is enjoined.

These arguments fail to show that the balance of the hardships will tip at all, let alone sharply, in Microsoft's favor absent the requested relief. Although Lindows.com certainly made a conscious decision to play with fire by choosing a product and company name that differs by only one letter from the world's leading computer software program, one could just as easily conclude that in 1983 Microsoft made an equally risky decision to name its product after a term commonly used in the trade to indicate the windowing capability of a GUI. The Court finds that these purposeful decisions cancel each other out. Even if Lindows.com has minimal resources to pay a large damages award, Microsoft's focus on injunctive relief as the preferred remedy for trademark infringement indicates that any inability to pay damages is not terribly detrimental to the plaintiff.

Microsoft also argues that its immense expenditures in promoting Windows as well as its multi-billion dollar revenue from these products dwarfs Lindows.com's 1.5 million dollar investment in promoting its Lindows marks. As a result, it stands to lose more from the violation of its trademark rights. In absolute terms, it is hard to argue with the comparison, but Lindows.com's investment also represents a much larger proportion of its resources and investment to date. Further, Microsoft has hundreds of millions of users worldwide. Although it has built substantial goodwill in its Windows mark, there is no concrete evidence that the goodwill will be degraded more than a de minimis amount

ORDER – 27

by the introduction of a Linux-based operating system. Even if all current users of Linux were to purchase Lindows OS immediately, this would still represent only a fraction of Microsoft's worldwide share of the operating system market. The relative size and strength of the parties also weighs dramatically in favor of Lindows.com. Further, the requested injunctive relief would eliminate the primary path the defendant has chosen to bring its product to market – the Lindows.com website. Finally, the Court views Microsoft's tarnishment argument as specious. Any software program is likely to have some defects upon release, and Microsoft has hardly been immune to these problems. See John Markoff, Stung by Security Flaws, Microsoft Makes Software Safety a Top Goal, N.Y. Times, Jan. 16, 2002, at C1 (describing an "embarrassing security flaw . . . found in . . . Windows XP, its new operating system.")

In sum, the Court finds that the balance of hardships does not tip sharply in Microsoft's favor.

## CONCLUSION

A protectable trademark is the cornerstone upon which a successful action under the Lanham Act is built. Lindows.com has presented sufficient evidence to rebut the presumption of validity of the Windows mark. Analysis of Microsoft's affirmative evidence in support of validity yields at most the conclusion that Microsoft has only raised serious questions about the merits of its case. The Court also finds that the balance of hardships does not tip sharply in favor of Microsoft.

It is necessary to emphasize that, at this nascent stage in the litigation, the Court's determination that there are serious questions regarding whether Windows is a non-generic name and thus eligible for the protections of federal trademark law is not a conclusive finding that the trademark is invalid. Rather, the procedural posture of the motion for preliminary injunction merely indicates that the moving party has failed to make a sufficient showing of likelihood of success on the merits. This finding, in

ORDER – 28

conjunction with the Court's determination that the balance of hardships does not sharply favor Microsoft, requires the Court to DENY the motion.

SO ORDERED this 15th day of March, 2002.

CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 29